**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JEFFREY A. BARNHILL and** | : | |
| **H.C.M.B.C., INC.,** | : | |
| **Plaintiffs** | : | |
| | : | |
| | : | **CIVIL ACTION NO. 1:CV-04-1858** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| | : | |
| **TRANS HEALTHCARE, INC.,** | : | |
| **TRANS HEALTH MANAGEMENT,** | : | |
| **INC., THI HOLDINGS, LLC, GTCR** | : | |
| **FUND VI, L.P., GTCR PARTNERS VI,** | : | |
| **L.P., GTCR GOLDER RAUNER, LLC,** | : | |
| **W. BRADLEY BENNETT, and** | : | |
| **EDGAR JANNOTTA, JR.,** | : | |
| **Defendants** | : | |

## MEMORANDUM

Before the Court are cross-motions for summary judgment by Defendants and partial summary judgment by Plaintiffs arising out of an employment dispute.  (Doc. Nos. 35, 38.) Plaintiff Barnhill alleges that he and Defendants entered into a binding employment contract that Defendants breached, whereas Defendants deny that a valid contract was formed and argue alternatively that Plaintiffs failed to meet conditions precedent to Defendants' obligations under the contract.  Defendants further argue that Plaintiffs have failed to produce evidence to support their equitable claims.  The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332.  The motions have been fully briefed and are ripe for disposition.  For the reasons that follow, the Court will grant Defendants' motion in part and will deny Plaintiffs' motion in toto.

I.     **Background**[1]

From February 2000 to June 2004, Plaintiff Jeffrey A. Barnhill provided finance-related

services to Defendant Trans Healthcare, Inc. ("THI"), a private health-care company in the

business of acquiring nursing homes.  Prior to working at THI's Camp Hill, Pennsylvania office,

Barnhill and his family lived in Coral Springs, Florida, where Barnhill provided financial

consulting services to other companies in the medical field.  In early 2000, after the conclusion of

Thomas R. Waye's brief tenure as THI's Chief Financial Officer, THI's then-President and Chief

Executive Officer, Anthony Misitano, requested that Barnhill provide "Chief Financial Officer

("CFO") related services to the Company" on an interim basis until a permanent CFO could be

hired, with the understanding that, should Barnhill's performance prove acceptable, he could be

offered a permanent position.  (Doc. No. 1, Plaintiffs' Ex. A.)  Barnhill had previously been

considered for the permanent CFO position, but THI claims that it refrained from hiring Plaintiff

because Barnhill was at that time under investigation by the Internal Revenue Service regarding

outstanding payroll taxes of a company for which Barnhill had previously served as CFO.  (Doc.

No. 36, ¶ 21; Doc. No. 43, ¶ 21.)

Barnhill, as an independent contractor hired through Plaintiff H.C.M.B.C., Inc.

("HCMBC"),[2] signed an agreement with THI on February 1, 2000, (the "February 2000 letter")

---

[1]      The following factual information is derived from Plaintiffs' and Defendants'
statements of material facts, the affidavits of Plaintiff Barnhill, Defendant Bennett, and Misitano,
and Plaintiffs' Complaint and accompanying exhibits.  To the extent that these facts are in
dispute, they will be noted as such.

[2]      HCMBC is a Florida S-Corporation of which Barnhill is the President and his
wife is the sole shareholder.  (Doc. No. 38, Dep. of Barnhill at 12-13.) The corporation's primary
function is to provide health care consulting, but it also provides photography assistance.  (Id. at
22-23.)

agreeing that Barnhill would provide consulting services in exchange for THI, in part, paying

HCMBC $156,000 annually.  (Doc. No. 1, Plaintiffs' Ex. A.)  Additionally, in the February 2000

letter, THI and HCMBC "agree[d] to formulate an incentive compensation arrangement  . . .

mutually agreeable . . . [which] shall be in the form of cash and/or equity" in THI.  (Id., ¶ 3(a).)

On March 22, 2000, a few weeks after Barnhill and his son moved from Florida into a

company-provided apartment in Pennsylvania, THI CEO Misitano and Barnhill signed a new

letter agreement (the "March 2000 letter").  (Doc. No. 1, Plaintiffs' Ex. B.)  This letter would,

effective April 3, 2000, convert Barnhill's position from a consultant through HCMBC to a direct

employee of THI.  The March 2000 letter states Barnhill's position as "Senior Vice President of

THI and Chief Financial Officer," lists an annual salary of $160,000, provides for vacation time,

health insurance, opportunity to receive a bonus, and payment of relocation expenses for Barnhill

and his family.  Most importantly, the letter provides Barnhill's equity participation in THI at

"3% of the Company," along with an "opportunity to co-invest with GTCR" (a venture capital

firm that was financing 80% of THI) and "participation in company stock option plan with award

grant to be determined once plan is implemented."  Id.

Misitano attested that the March 2000 letter agreement was rescinded very soon after it

was signed, allegedly because THI learned that the IRS investigation into Barnhill remained

ongoing, despite Barnhill's statements to the contrary.  (Doc. No. 38, Dep. of Misitano at 27-

28.)[3]  Barnhill continued to provide financial services to THI and continued to be paid through

---

[3]        Plaintiffs deny the suggestion that Barnhill had told THI that the investigation had
been closed, instead claiming that Barnhill had merely told THI that the investigation would not
be a problem because he had done nothing wrong.  (Doc. No. 43, ¶ 32.)  He points to his
subsequent September 2001 exoneration by the IRS as evidence of his innocence in the matter.
(Id. ¶ 33.)  Defendants further claim that Plaintiff consented to the rescinding of the March 2000

HCMBC.  Nevertheless, he contends that he became a THI employee working under the conditions of the March 2000 letter commencing on the letter's April 3, 2000 effective date, and he supports this claim by pointing to documents that list him as the company's CFO.

On December 31, 2001, Misitano and Barnhill signed a third letter agreement (the "December 2001 letter").  (Doc. No. 1, Plaintiffs' Ex. D.)  In contrast to the March 2000 letter, the December 2001 letter gave Barnhill the title "Senior Vice President Finance" and did not include the title of CFO.  The letter further provided that Barnhill would receive more compensation than agreed to in the March 2000 letter, but also reduced Barnhill's vacation and bonus opportunities.  The December 2001 letter contemplates "participation in company stock option plan with award grant to be determined once plan is implemented.  One (1) percent of THI Common Stock on terms and conditions consistent with Senior Management Agreement."  Id. After this point, Barnhill began to be taxed as an employee of THI.

At THI, an employment contract for a senior executive is typically accompanied by a Senior Management Agreement ("SMA"), a document that essentially exchanges a severance package for executives in exchange for them promising not to disclose company secrets or solicit company clients or employees for a specified period after the termination of their employment. The December 2001 letter appears to contemplate that an SMA would be created for Barnhill. THI's SMAs tended to include provisions as to how and when company stock could be purchased and when it would be vested in the executive.  Barnhill attests that soon after November 19, 2001, Misitano told him to create a SMA for himself out of the SMA prepared for

letter, a fact that is neither confirmed nor denied through any written evidence of record.  (Doc. No. 36, ¶ 35.)

former CFO Waye.  (Doc. No. 38, Dep. of Barnhill at 189.)[4]  Barnhill did so on November 26,

2001, but when he presented it to Misitano, he did not review it, instead instructing Barnhill to

wait until a time when the office was less busy.  (Id. at 176-77; Doc. No. 1, ¶¶ 33, 36.)

Defendants' outside counsel, Kirkland & Ellis, was preparing SMAs for THI management in

January 2004 but had not created a final SMA for Barnhill by the time he was terminated.[5]

In September 2003, THI hired Defendant W. Bradley Bennett as the firm's CFO.  (Doc.

No. 38, Dep. of Bennett at 7.)  After Misitano resigned, Bennett became CEO in June 2004. (Id.)

For the expressed reasons that Barnhill's "services were no longer required" and that "his role

had morphed into a situation where there was nothing for him to do," Bennett informed Barnhill

that his employment with THI was to be terminated.  (Id. at 76.)  Barnhill then presented Bennett

with all of the letter agreements and SMAs described above,[6] claiming that these agreements

entitled him to severance benefits and equity in the company.[7]  (Doc. No. 36, ¶ 58.)

On June 11, 2004, Bennett offered Barnhill a severance package of $50,000 plus six

---

[4]     Defendants deny that Barnhill was told to create a SMA in 2001, arguing that the
November SMA was "surreptitiously prepared" without anyone's knowledge.  (Doc. No. 47 at 4
n.2.)  Misitano does not seem to remember giving such instructions.  (Doc. No. 38, Dep. of
Misitano at 39, 132.)

[5]     The parties dispute the amount of effort required to finalize the SMA document,
whether finalization of a written document was merely a formality at the time of termination, or
if it required substantive effort on the parts of Barnhill and Defendants' outside counsel.

[6]     All of these documents were presented except for the January 2004 Draft SMA,
whose existence was not known to Plaintiffs until discovery for the instant case.

[7]     Plaintiffs allege that Bennett made statements to the effect that he was aware that
Barnhill's access to company stock had been delayed merely by "final paperwork," (Doc. No. 1,
¶ 57) a statement that Bennett does not concede or remember (Doc. No. 38, Dep. of Bennett at
85).

months' salary, in exchange for Barnhill agreeing to release THI from any claims against the company.  (Doc. No. 1, ¶ 58.)[8]  Plaintiff rejected this offer.  (Doc. No. 38, Cont'd Dep. of Barnhill at 13-14.)  Instead, Barnhill expected to receive one year's salary and continued health insurance as severance pay, along with THI agreeing to honor Plaintiff's asserted right to purchase equity in the company, consistent with the terms of the SMAs that he had reviewed.  (Doc. No. 1, Plaintiffs' Ex. B.)  THI declined Plaintiff's counter-offer, and Barnhill was officially terminated on June 18, 2004.  (Doc. No. 1, ¶ 56.)

Plaintiffs filed suit on August 20, 2004, alleging Defendants' breach of contract with Plaintiff HCMBC (Count I) and with Plaintiff Barnhill (Count II).  Should formation of a contract or its breach not be established, Plaintiffs in the alternative bring counts of promissory and equitable estoppel (Counts III and IV), fraud/intentional and negligent misrepresentation (Counts VI and VIII), and civil conspiracy (Count IX).[9]  The parties attempted to mediate the claims on August 19, 2005, but mediation was unsuccessful.  (Doc. Nos. 31, 32.)  After discovery was completed, Defendants moved for summary judgment on all remaining counts, and Plaintiffs moved for partial summary judgment on Counts I and II.

## II.    Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the

---

[8]    See also Doc. No. 38, Dep. of Bennett at 83.  This offer appears to be represented in a discovered document, albeit without the $50,000 stated, and with a continuation of COBRA health insurance payments.  (Doc. No. 40, Plaintiff's Ex. 11.)  As such, Plaintiffs deny that the offer included an extra $50,000.  (Doc. No. 43, ¶ 61.)

[9]    On March 13, 2006, Plaintiffs voluntarily dismissed claims of unjust enrichment (Count V), breach of fiduciary duty (Count VII), and aiding and abetting (Count X).  (Doc. No. 34.)

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; see also Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248-51 (1986). When deciding a motion for summary

judgment, the Court views the facts in the light most favorable to the nonmoving party, who is

"entitled to every reasonable inference that can be drawn from the record." Merkle v. Upper

Dublin Sch. Dist., 211 F.3d 782, 788 (3d Cir. 2000). However, the non-moving party may not

simply sit back and rest on the allegations in his complaint; instead, he must "go beyond the

pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and

admissions on file, designate specific facts showing that there is a genuine issue for trial."

Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (internal quotations omitted). Summary

judgment should be granted where a party "fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden

at trial." Id. at 322.

**III.   Discussion**

    **A.   Contractual claims**

    "A contract is a promise or a set of promises for the breach of which the law gives a

remedy, or the performance of which the law in some way recognizes as a duty." Forest Glen

Condo. Ass'n v. Forest Green Commons L.P., 2006 Pa. Super. LEXIS 656 at *12 (Pa. Super.

May 2, 2006) (citing Restatement (Second) Contracts § 1 (1981)). It "is formed when the parties

to it (1) reach a mutual understanding, (2) exchange consideration, and (3) delineate the terms of

their bargain with sufficient clarity." Weaverton Transp. Leasing, Inc. v. Moran, 834 A.2d 1169,

1172 (Pa. Super. 2003).

Under Pennsylvania law,[10] a breach of contract claim requires that plaintiff establish (1) the existence of a contract, (2) a breach of a duty imposed by the contract, and (3) damages. Sullivan v. Chartwell Investment Partners, LP, 873 A.2d 710, 716 (Pa. Super. 2005) (citing J.F. Walker Co., Inc. v. Excalibur Oil Group, Inc., 792 A.2d 1269, 1272 (Pa. Super. 2002)). "While every element must be pled specifically, 'it is axiomatic that a contract may be manifest orally, in writing, or as an inference from the acts and conduct of the parties.'" Id. The terms of a contract are to be determined only by the contract's express language when the words are clear and unambiguous, but ambiguity in interpretation calls for the weighing of extrinsic evidence in order to resolve the dispute. Krizovensky v. Krizovensky, 624 A.2d 638, 642 (Pa. Super. 1993). A contract "is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction." Id. (citing Z & L Lumber Co. of Atlasburg v. Nordquist, 502 A.2d 697, 700 (Pa. Super. 1985)).

A subsequent oral modification of a written agreement does not violate the parol evidence rule; such later oral modifications may be evidenced "by writings or by words or by conduct or by all three." Kersey Mfg. Co. v. Rozic, 215 A.2d 323, 324 (Pa. Super. 1965). Evidence of oral modification must be specific and direct. Gloeckner v. School Dist., 175 A.2d 73, 75 (Pa. 1961). If a party's "credibility is in issue, oral proof requires the jury's consideration and prevents the entering of a summary judgment." Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 474 (Pa. 1979).

In the instant case, Barnhill worked for Defendants essentially in two stages: first as an

---

[10]     The parties appear to agree that Pennsylvania law governs the claims in this case.

Case 1:04-cv-01858-YK   Document 84   Filed 07/21/06   Page 9 of 20

independent contractor through HCMBC, and later as an employee of THI.  Plaintiffs divide the

breach of contract claims accordingly, and Defendants raise different defenses to the two claims

of breach.  Accordingly, the Court will separately analyze Plaintiffs' contract claims.

### 1.   Plaintiff HCMBC

In Count I, Plaintiffs allege that Defendants breached Plaintiff HCMBC's contract with

THI to provide consulting services through Barnhill.  The only documentation that names

HCMBC as a party to a contract is the February 2000 letter.  Plaintiffs contend that the March

2000 letter's discussion of 3% equity that would be available to Plaintiff Barnhill was an

elucidation of the promise for a "mutually agreeable" incentive compensation arrangement "in

the form of cash and/or equity" that is listed in ¶ 3(a) of the February 2000 letter.  It is not

evident that the March 2000 letter or any other letter that portends to have Defendants engage

directly with Plaintiff Barnhill could possibly inform an agreement between Defendants and

Plaintiff HCMBC.[11]  Moreover, it is clear from the plain reading of the February 2000 letter that

an incentive package could be made out of "cash and/or equity," meaning the package could

consist of one or the other, but not necessarily both. While Plaintiffs assert the independence of

cash incentives and equity in the February 2000 letter, the letter's terms are unambiguous and do

---

[11]    Along with the parties to a contract, "third party beneficiaries" can also enforce the terms of that contract.  See Chen v. Chen, 893 A.2d 87, 89 n.5 (Pa. 2006); see also Guy v. Liederbach, 459 A.2d 744 (Pa. 1983) (adopting in Pennsylvania the Restatement (Second) of Contracts § 302).  Despite the fact that Barnhill continued to be paid through his wife's S-Corporation as an independent contractor between March 2000 and December 2001, at the time of the signing of the March 2000 letter there was no indication that it was anticipated to benefit HCMBC.  Therefore HCMBC is unable to enforce agreements such as the March 2000 or December 2001 letters as contracts, even if it is established that the letters constitute binding contracts, because HCMBC is neither a party to nor a third party beneficiary of any agreements following the February 2000 letter.

not support this interpretation.  (Doc. No. 43, ¶ 26.)

Further, Defendants note that they did, in fact, pay HCMBC "over $100,000 in cash bonuses tied to performance and successful acquisitions."  (Doc. No. 37 at 8.)  This figure appears to be taken from a document marked "Incentive Professional Fees" and directed to "HCMBC/Barnhill," stating that Defendants had paid Plaintiffs $141,000 in cash by May 26, 2003.  (Doc. No. 39, Defendants' Ex. Q.)  Plaintiffs concede that HCMBC was paid bonuses, usually relating to successful acquisitions.  (Doc. No. 38, Dep. of Barnhill at 150, 206.)  The document referencing "Incentive Professional Fees" even describes the basis by which cash bonuses would be meted out: "Acquisitions: 0.150% of purchase price; Lease Arrangements: 0.125% of Imputed Debt at 8 times."  (Doc. No. 39, Defendants' Ex. Q.)  Plaintiffs' acceptance of such an amount to be paid to HCMBC appears to satisfy "an incentive compensation agreement for Consultant mutually agreeable to Company CEO and Consultant . . . in the form of cash and/or equity" since it is undisputed that more than $100,000 was offered and accepted. The record does not reflect evidence to support Plaintiffs' claim that the tendered bonuses were unacceptable, nor does the record contain evidence that Plaintiffs attempted to negotiate with THI regarding the incentives.

The fact that HCMBC now claims that it is due five million dollars in equity to satisfy ¶ 3(a) of the February 2000 letter does not change the documented fact that Plaintiffs accepted cash incentives, and the evidence of record therefore demonstrates that THI performed its obligation in accordance with the terms of the agreement providing that incentives would be paid with cash or equity.  Because Count I is based solely on Plaintiffs' interpretation of an unambiguous term in the February 2000 letter, later oral testimony that HCMBC was to be included in the terms of

10

the March 2000 letter is irrelevant, as the Court need not consider oral testimony to interpret the terms of an otherwise unambiguous document. Krizovensky, 624 A.2d at 642. Accordingly, the Court will grant Defendants' motion for summary judgment with regard to Count I and will deny Plaintiffs' motion on that Count.

### 2.     Plaintiff Barnhill

In Count II, Plaintiff Barnhill alleges that the March 2000 letter constituted a valid and enforceable contract and that THI breached the contract. Specifically, Barnhill claims that the March 2000 letter obligated Defendants to provide him equity participation in 3% of THI pursuant to the terms of the March 2000 letter. Additionally, Plaintiff contends that Defendants were contractually bound to offer him 1% of THI equity in accordance with the terms of the December 2001 letter, and a severance package according to the terms of an unexecuted SMA. As discussed below, the alleged contracts at issue are facially unclear and the parties vigorously dispute many of the relevant facts. The Court will address each of the alleged contracts in turn.

### a.     The March 2000 Letter

THI's former CEO, Misitano, who is not named as a defendant, attested that the March 2000 letter was almost immediately rescinded, with Plaintiff Barnhill's understanding and agreement, after Defendants learned that the IRS investigation into Plaintiff Barnhill remained ongoing. Despite the appearance of a fully-executed agreement, Defendants maintain that the March 2000 letter did not form a contract because Plaintiff assented to the revocation of the letter agreement immediately after it was executed. Such revocation could be deemed a later oral modification of a prior written agreement, which can be evidenced by writings, words, or conduct. Kersey Mfg. Co., 215 A.2d at 324.

11

Defendants offer evidence in support of this argument, citing a letter from Misitano to Barnhill apparently granting Barnhill a raise, where Barnhill's "current fee" as of January 23, 2001 was $156,000, less than the $160,000 that it would have been had the March 2000 letter been in effect.  (Doc. No. 39, Defendants' Ex. H.)  Without providing written tax records, Defendants contend that Barnhill admitted that he continued to be paid as an independent contractor through HCMBC until December 2001, receiving a 1099 tax form, rather than a standard W-2 form that employees receive.  (Doc. No. 38, Dep. of Barnhill at 131.)  Defendants rely on the foregoing evidence to support their position that the March 2000 letter did not form a binding contract between the parties, as all of the specific terms of the agreement continued to be those out of the February 2000 letter.

Plaintiff Barnhill counters with evidence to support his claim that the March 2000 letter was being performed by both parties under contractual terms, with the modification that his salary continued to be paid through HCMBC for tax purposes.  He cites the fact that in official company documents Defendant THI held Barnhill out to be the company's CFO, the title provided in the March 2000 letter.  (Doc. No. 40, Plaintiffs' Ex. 5.)  Although this document labeling Barnhill as CFO appears to have been prepared in 2003, after the December 2001 letter ostensibly would have gone into effect to change Barnhill's title, a reasonable juror could believe that this continued use of the CFO title stems from a March 2000 letter that was merely modified, rather than revoked.  Barnhill also attests that he began to accrue and use vacation time and received health insurance after the March 2000 letter, as contemplated by that agreement.  (Doc. No. 38, Dep. of Barnhill at 153-156.)

This dispute boils down to differing claims of oral testimony offered by Plaintiffs and

12

Defendants, each backed up with supporting evidence.  A genuine issue of material fact therefore remains as to the extent of oral modification following the March 2000 letter, making summary judgment improper on this claim.

###### b.     The December 2001 Letter

Plaintiff Barnhill also claims that, under the terms of the December 2001 letter, he is due a 1% equity stake in THI and a severance package typical of those given to THI senior management.  Defendants do not deny that the December 2001 letter imposed obligations on them; rather, Defendants claim that they fulfilled all of their obligations under the terms of the letter agreement, and Barnhill cannot enforce these two terms because he failed to meet the conditions precedent to his receiving these benefits.

An opportunity to invest in company stock at a certain price is considered an option: "from the view point of the optioner, an option is a binding contract subject to the performance of a condition precedent by the optionee.  From the viewpoint of the optionee, an option is an irrevocable offer which the optionee can convert into a binding bilateral contract by acceptance." Sheils v. Pfizer, Inc., 156 Fed. Appx. 446, 449-50 (3d Cir. 2005) (quoting Palo Alto Town & Country Village v. BBTC Company, 521 P.2d 1097, 1102 (Cal. 1974)).  If the manner of exercising the option is explicit, it must be strictly followed.  Id.

In the instant case, the December 2001 letter does not expressly determine the method by which Barnhill was required to exercise his 1% equity stake.[12]  Plaintiff Barnhill attests that in

---

[12]     The copies of SMAs presented to the Court, at different levels of completion, do help explain the manner by which company stock options are to be exercised; however, because Barnhill's right to a SMA remains in contention, the methods of exercising his option may also be less concrete.

2002 he attempted to sign over a bonus check so that Misitano could use the proceeds to pay for a portion of Barnhill's option, but Misitano does not remember Plaintiff making such an offer. (Doc. No. 38, Dep. of Misitano at 44.)  Plaintiffs also present a promissory note for a portion of Barnhill's option, but Defendants dispute that this document was ever tendered to the company. (Doc. No. 1, Plaintiffs' Ex. C at 17.)  Genuine issues of material fact therefore exist as to whether Plaintiff tendered the funds necessary to exercise his option or otherwise satisfied his contractual obligations prior to exercising his option.  Therefore, summary judgment is not appropriate on this issue.

### c.      Senior Management Agreement

Further, Plaintiff claims that he was contractually entitled to a severance package as provided through a SMA, pursuant to the terms of the December 2001 letter which mention it specifically.  Additionally, Plaintiff attests that in early November 2001 Misitano told him that he would be receiving a SMA in the style of former CFO Waye.  (Doc. No. 38, Dep. of Barnhill at 189.)  With this information, Plaintiff took steps to create a draft SMA for himself in November 2001.  (Doc. No. 1, Plaintiffs' Ex. C.)  However, this document was never signed by anyone at THI.  Nevertheless, Misitano continued to indicate that Barnhill was due a SMA and that by 2002 the finalization was "strictly a form thing, not a substance thing."  (Id. at 128, 159.)

In contrast to Plaintiffs' claim of a right to a SMA, Defendants argue that Barnhill had no right to a SMA and that even if he did have such a right, Barnhill failed to meet obligations that were conditions precedent to receiving one.  In support, Defendants rely on the fact that the SMA language in the December 2001 letter is limited to discussion of stock options, and does not specifically state that Barnhill was to receive a SMA.  (Doc. No. 47 at 4.)  Defendants also rely

14

on the testimony of Misitano, which laid out Barnhill's obligations in the SMA-creation process. In 2003, Barnhill was called to "spearhead the initiative" in aiding Kirkland & Ellis in preparing SMAs.  (Doc. No. 38, Dep. of Misitano at 43.)  This element of Barnhill's employment obligations required him to gather together "a host of issues," including tax strategy and valuation, that needed to be considered before Kirkland & Ellis could finalize the SMAs they were preparing, but this never happened.  (Doc. No. 38, Dep. of Misitano at 43-45.)  As a result, by January 2004 counsel was able to create only an incomplete draft, which could not be finalized by the time that Barnhill's employment was terminated.  (Doc. No. 40, Plaintiffs' Ex. 6.)

All three SMAs –  the Waye SMA (Doc. No. 40, Plaintiffs' Ex. 2), the November 2001 SMA that Plaintiff drafted (Doc. No. 1, Plaintiffs' Ex. C), and the January 2004 SMA that Kirkland & Ellis prepared (Doc. No. 40, Plaintiffs' Ex. 6) – provide that executives would be entitled to a severance package including one year's salary and continued participation "in the Company's health insurance plans."[13]  However, none of these documents was issued to Barnhill. The first was prepared for Waye, THI's previous CFO, and although Barnhill might have been promised a SMA similar to Waye's, it is not certain that the severance terms would have been the

---

[13]     Each document also explains that if the employee is terminated "with Cause" then THI will not be obligated to provide this severance pay.  Defendants contend that the "after-acquired evidence doctrine" allows them to retroactively deem a termination "for Cause."  (Doc. No. 37, at 10 n.6.) (citing Dobinsky v. Crompton & Knowles Colors, Inc., 2004 U.S. Dist. LEXIS 20374, at *14-15 (M.D. Pa. March 30, 2004)).  Defendants claim to have learned only in discovery that Barnhill made illegal campaign contributions for and through THI.  The Court finds that the evidence of record on this issue is in dispute, and therefore a genuine issue of material fact exists as to whether Barnhill's actions rise to the level required to be retroactively terminated for cause, especially without documentation regarding the specifics of the action in the record.

same.[14]  The November 2001 SMA was not signed or even reviewed by anyone other than

Barnhill, and the January 2004 SMA was not completed.  (Doc. No. 39, Dep. of Barnhill at 177.)

While these written SMAs appear to leave some questions, parties "may bind themselves

contractually prior to the execution of a written document through mutual manifestations of

assent, even where a later formal document is contemplated."  Luber v. Luber, 614 A.2d 771, 773

(Pa. Super. 1992) (citing Krause v. Great Lakes Holdings, Inc., 563 A.2d 1182 (1989)).  A

reasonable jury could infer specific terms and mutual manifestations of assent from this set of

documents and the disparate claims as to the status of Barnhill's SMA prior to termination, but

the evidence on this issue is in conflict and the Court cannot find that summary judgment is

warranted for either party.  Accordingly, the Court will deny summary judgment to both parties

with respect to Count II.

**B.     Additional Claims**

In addition to the claims for breach of contract, Plaintiffs seek relief under various quasi-

contractual theories of relief, including estoppel, fraudulent misrepresentation, and conspiracy.

Defendants have moved for summary judgment on these claims.

**1.     Promissory Estoppel and Misrepresentation**

Pennsylvania has adopted the doctrine of promissory estoppel as set forth in the

Restatement (Second) of Contracts § 90, which provides: "[a] promise which the promisor

should reasonably expect to induce action or forbearance on the part of the promisee or a third

person and which does induce such action or forbearance is binding if injustice can be avoided

---

[14]     For example, Misitano confirms that his own SMA provided for two years'
severance pay.  (Doc. No. 38, Dep. of Misitano at 93.)

only by enforcement of the promise.  See Pittsburgh Baseball, Inc. v. Stadium Auth., 630 A.2d

505, 509 n.5 (Pa. Commw. Ct. 1993) (noting Pennsylvania's adoption of the Second Restatement

on this issue).  Relevant to the necessity of enforcement is the formality of the promise, and the

evidentiary, cautionary, and deterrent functions of the circumstances of enforcement.  Thatcher's

Drug Store v. Consolidated Supermarkets, 636 A.2d 156, 160 (Pa. 1994).  To establish equitable

estoppel, the plaintiff must prove that a party (1) negligently misrepresented material facts (2)

knowing or having reason to know that the other party will justifiably rely upon the

misrepresentation to its detriment, and (3) the other party so relies.  Walker v. Workmen's

Compensation Appeal Board, 656 A.2d 164, 170 (Pa. Commw. 1995) (citing Williams v.

Workmen's Compensation Appeal Board, 646 A.2d 633, 636 (Pa. Commw. 1994)).  "Equitable

estoppel applies to prevent a party from assuming a position or asserting a right to another's

disadvantage inconsistent with a position previously taken."  Blofsen v. Cutaiar, 333 A.2d 841,

843 (Pa. 1975) (citing 1 P.L.E. Estoppel § 21).  Estoppel works to prevent the person inducing a

belief from later "deny[ing] that the state of facts does in truth exist . . . or deny[ing] or

repudiat[ing] his acts, conduct, or statements."  Id.  (quoting Northwestern National Bank v.

Commonwealth, 27 A.2d 20, 23 (Pa. 1942)).

　　　To establish intentional/fraudulent misrepresentation, a plaintiff must show: (1) a

representation; (2) material to the transaction; (3) made with knowledge of its falsity or reckless

disregard for whether it was true or false; (4) with the intent of misleading another into relying on

it; (5) justifiable reliance on the misrepresentation; and (6) a resulting injury proximately caused

by the reliance.  Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994).  To prove negligent

misrepresentation, a plaintiff must show: (1) a misrepresentation of a material fact; (2) the

representor must either know of the misrepresentation, must make the misrepresentation without

knowledge as to its truth or falsity or must make the representation under circumstances in which

he ought to have known of its falsity; (3) the representor must intend the representation to induce

another to act on it; and (4) resulting injury to the party acting in justifiable reliance on the

misrepresentation.  Id. at 890.[15]

The Court has reviewed the evidence of record and has determined that there remain

material facts in dispute relevant to Plaintiffs' claims of estoppel and misrepresentation.

Accordingly, summary judgment on these claims is unwarranted.

## 2.    Civil Conspiracy

Plaintiffs additionally claim that Defendants should be liable for civil conspiracy, in that

they allegedly "combined or agreed to intentionally or negligently misrepresent" to Plaintiffs that

they would be provided equity participation and severance benefits.  (Doc. No. 1, ¶ 156.)  Proof

of a civil conspiracy requires showing that two or more persons combined to do an unlawful act.

---

[15]       Defendants raise the affirmative defense that since many of the allegedly
fraudulent statements were made prior to August 20, 2002, they are time-barred by
Pennsylvania's two-year statute of limitations.  While the claim accrues when the injury is
suffered, the clock does not start running on fraudulent statements until "the plaintiff knows, or
reasonably should know, that he or she has been injured and that the injury was caused by the
conduct of another."  Dongelewicz v. First Eastern Bank, 80 F. Supp. 2d 339, 345 (M.D. Pa.
1999).  See also Sungard Recovery Services, L.P. v. Unisource Worldwide, 2002 U.S. Dist.
LEXIS 22256 at * 8 (E.D. Pa. Oct. 30, 2002) (describing that the time of accrual of an injury is
often left to a jury).  Though Defendants believe that it is "demonstrably unreasonable" for
Plaintiff to wait for written documentation of Plaintiff's promises for an equity stake and
severance package for four years, they point to no law that sets a rigid guideline on this matter.
(Doc. No. 47 at 8.)  In fact, the January Draft SMA, (Doc. No. 40, Plaintiffs' Ex. 6) which
includes "Jeff [Barnhill]'s" name on it and was still being worked on four years after Barnhill
took a job with the company, suggests that at some point Defendants considered such a long wait
to be demonstrably reasonable.  Defendants' claim that the claim of fraud is time-barred is
denied, at least for purposes of summary judgment.

Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (Pa. 1979).  "[T]hough a conspiracy must ordinarily be proved by circumstantial evidence, yet it is not to be forgotten that the charge of conspiracy is easily made . . . .  Mere suspicion, possibility of guilty connection, is not to be received as proof in such a case . . . ."  Benford v. Sanner, 40 Pa. 9, 15 (1861).

In the instant case, Plaintiffs have failed to produce any evidence of a combination among the Defendants, or among the Defendants and Misitano, that would establish a claim of civil conspiracy.  Accordingly, Defendant's motion for summary judgment will be granted with respect to Plaintiffs' civil conspiracy claim set forth in Count IX.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JEFFREY A. BARNHILL and** | : | |
| **H.C.M.B.C., INC.,** | : | |
| **Plaintiffs** | : | |
| | : | |
| | : | **CIVIL ACTION NO. 1:CV-04-1858** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| | : | |
| **TRANS HEALTHCARE, INC.,** | : | |
| **TRANS HEALTH MANAGEMENT,** | : | |
| **INC., THI HOLDINGS, LLC, GTCR** | : | |
| **FUND VI, L.P., GTCR PARTNERS VI,** | : | |
| **L.P., GTCR GOLDER RAUNER, LLC,** | : | |
| **W. BRADLEY BENNETT, and** | : | |
| **EDGAR JANNOTTA, JR.,** | : | |
| **Defendants** | : | |

<u>**ORDER**</u>

And now, this 21st day of July, 2006, for the reasons set forth in the within memorandum,

**IT IS HEREBY ORDERED THAT:**

1.   Plaintiffs' Motion for Summary Judgment (Doc. No. 38) is **DENIED**.

2.   Defendants' Motion for Summary Judgment (Doc. No. 35) is **GRANTED** with respect to Counts I and IX of the Complaint.

3.   In all other respects, Defendants' motion for Summary Judgment is **DENIED**.

4.   The Clerk of Court shall refrain from entering judgment on Counts I and IX until the conclusion of this action.

S/ Yvette Kane
Yvette Kane
United States District Judge